Louis B. Osmond, Plaintiff, v. N. Y. Cotton Exchange, Inc., M. D. Anderson and Others, Copartners Doing Business as Anderson, Clayton & Co., Geo. McFadden and Others, Copartners Doing Business as Geo. H. McFadden & Bro., Defendants.

Supreme Court, New York County, July 26, 1928.

**Brokers — cotton brokers — action to restrain New York Cotton Exchange and members from tendering cotton which does not conform to contracts — injunction pendente lite denied on ground plaintiff has not shown that cotton in storage is ineligible under United States Cotton Futures Act (U. S. Code, tit. 26, chap. 13, § 735).**

Plaintiff seeks an injunction *pendente lite*, restraining the New York Cotton Exchange and various members thereof from tendering, under contracts made on the exchange, cotton which does not conform with the requirements of the contracts. While the plaintiff alleges that the defendants have held in the port of New York approximately 200,000 bales of cotton, a large portion of which is ineligible, under section 5 of the United States Cotton Futures Act (U. S. Code, tit. 26, chap. 13, § 735), such allegations are refuted by the defendants by proof that only a very small portion of the cotton is ineligible.

Furthermore, it appears that the Federal government, through its inspectors operating pursuant to the Cotton Futures Act, passes upon the quality of the cotton and that certification by the examiners appointed by the Secretary of Agriculture conclusively establishes the eligibility of cotton for delivery against contracts made on the New York Cotton Exchange. There is grave doubt that the plaintiff will succeed on a trial, and, therefore, it is improper to grant an injunction *pendente lite*.

Motion for temporary injunction.

*Milton S. Cohn* and *S. Oliver Levy*, for the plaintiff.

*Cadwalader, Wickersham & Taft* [*Henry W. Taft, George Coggill* and *Francis Dean* of counsel], for the defendant N. Y. Cotton Exchange.

*Bouvier, Caffey & Beale*, for the defendant John H. McFadden.

*Davis, Polk, Wardwell, Gardiner & Reed*, for the defendant Anderson, Clayton & Co.

Frankenthaler, J. Plaintiff seeks an injunction *pendente lite* restraining the New York Cotton Exchange, Inc., and various members thereof from tendering or delivering, under contracts made on the exchange, cotton which does not conform with the requirements of those contracts. He alleges in his complaint that between May 1, 1926, and January 1, 1928, he purchased, through members of the exchange certain contracts for the future delivery of cotton; that the contracts, in accordance with the rules and regulations of the New York Cotton Exchange, provided in effect that no cotton should be considered a good tender thereunder

which failed to comply with the standards specified in section 5 of the United States Cotton Futures Act,* and that the exchange was under a duty and obligation to inspect and examine all cotton delivered against contracts made on its floor and to protest and reject any ineligible cotton. He maintains further that during the period above mentioned there was held in the port of New York, subject to delivery against cotton futures contracts, a stock of cotton averaging about 200,000 bales, owned and controlled primarily by the individual defendants; that a large portion of this cotton was ineligible for delivery under section 5 of the Cotton Futures Act, but that it was, nevertheless, repeatedly tendered by said defendants as a good delivery, with the result that the market price of contracts for the future delivery of cotton was artificially depressed to the intrinsic value of the inferior cotton; that the exchange, in violation of its duty, permitted the tender of ineligible cotton against contracts entered into by its members, and that the contracts which plaintiff still holds will be rendered valueless unless the defendants are restrained from continuing to tender ineligible and inferior cotton in purported performance thereof. In his supporting affidavit plaintiff contents himself to a great extent with generalities. He states that the charter of the exchange requires that it inspect all bales of cotton to be tendered under its contracts and that, since its organization, it has been accustomed to make such an inspection and to protest ineligible cotton. He claims that traders in cotton rely upon the exchange's inspection and regard its failure to reject as a sign of eligibility. He charges the individual defendants with having intentionally shipped to this port thousands of bales of ineligible cotton which had been certified as suitable for tender under the Cotton Futures Act by the United States Department of Agriculture, claiming that their purpose was to depress prices and thereby profit from their market manipulations. He complains of the failure of the exchange to protest to the Federal government and to warn the holders of contracts of the presence of the large quantity of inferior cotton, of which, he contends, the exchange was well aware. He alleges that about 50,000 bales out of 200,000 on hand in the port of New York fail to conform to the government standard. In support of this assertion, he states that a body of experts appointed by a subcommittee of the United States Senate reclassified 172,000 of the bales, rejected 6,761 outright and found that there were between 40,000 and 41,000 bales additional which were less than the staple length of seven-eighths of an inch, required

* 39 U. S. Stat. at Large, 476, as amd. by 40 id. 1351; U. S. Code, tit. 26, chap. 13, § 735.

by law. Additional affidavits submitted in plaintiff's behalf add little to the foregoing. One Ganier states that in November, 1927, he examined a number of samples of cotton which had been delivered against contract in New York and found them to constitute an improper tender; that he protested to the president of the exchange, who told him there had been complaints about the quality of cotton delivered, but that he did not consider the exchange responsible, as the matter was entirely in the hands of the United States government. When the answering affidavits are read it becomes apparent, however, that the extravagant claims of the plaintiff are without foundation. Prior to the passage of the United States Cotton Futures Act in 1916,* it is true, the New York Cotton Exchange determined the quality, grade and length of staple of cotton deliverable under contracts made upon the exchange. A " classification committee " of the exchange was under a duty to examine samples taken from the bales in order to ascertain whether they were in accord with the standards adopted. When cotton was tendered for delivery against contracts made on the exchange, the tender was made by delivering a negotiable warehouse receipt, accompanied by a certificate of classification issued by the classification committee, stating the grade of the cotton. This situation continued until the act was amended in 1919.† Since then the exchange ceased to classify or grade cotton, that function being transferred to " cotton examiners " appointed by the Secretary of Agriculture pursuant to the Cotton Futures Act and regulations promulgated by him thereunder. The only duty that is still performed by employees of the exchange is the " inspection " of cotton. This consists of an examination of the physical condition and the weight of the bales and the taking of samples from them. These samples are then submitted to the Federal examiners who determine the grade, quality and length of staple of the cotton and classify it accordingly. Such cotton as they find conforms with the requirements of the Cotton Futures Act receives a certificate, and thereafter constitutes a proper tender under that statute. Section 44, subdivision (a), of the by-laws of the exchange provides in part that " negotiable warehouse receipts * * * accompanied by a certificate of grade issued by the Secretary of Agriculture or by a notice of grade, validated by the Secretary of Agriculture, shall be a good delivery in fulfillment of contracts for future delivery," and it is, therefore, clear that certification by the examiners appointed by the Secretary of Agriculture conclusively establishes the eligibility of cotton for delivery against contracts made on the exchange. It follows that

* See 39 U. S. Stat. at Large, 476.    † See 40 U. S. Stat. at Large, 1351.

even if the exchange has the right to make an independent examination and classification, any attempt on its part to do so would be a work of supererogation, and, what is more, would be utterly useless. Its classification could not add to or detract from the eligibility of cotton which had received certification at the hands of the cotton examiners representing the United States government. Moreover, cotton which has been graded and classified by the official examiners can be re-examined only once under the regulations issued by the Secretary of Agriculture. This cannot be done except upon request either of the owner of the cotton who originally requested its classification or of the person to whom the owner delivers the cotton. Only where the exchange itself purchases the cotton — which is apparently never the case — can it request a review of the examiners' classification and grading. Assuming, however, that the exchange possesses the *right* to have an independent examination, it assuredly owes no *duty* to any of its members to examine cotton tendered for delivery against contracts entered into by them and, *a fortiori*, it is under no such obligation to non-members, such as the plaintiff in this action. Moreover, when we look into the merits of plaintiff's contention that the 200,000 bales held in the port of New York include about 50,000 bales of ineligible cotton, we find that the answering affidavits vigorously controvert his claim in this direction. After 6,761 bales had been found ineligible by the experts appointed by the United States Senate Subcommittee the Secretary of Agriculture sent official examiners from the Appeal Board of Review of Examiners of the Bureau of Agricultural Economics to examine these bales. They examined 3,295 bales and found only 1,413 untenderable. The balance of the 6,761 bales had been shipped out of New York some time prior to the reclassification, except for about 100 bales which could not be located. An examination of the report of the Senate subcommittee fails to disclose any support for plaintiff's statement that between 40,000 and 41,000 additional bales were declared ineligible for delivery. The views expressed by the " classers " employed by the subcommittee are annexed to its report in the form of an appendix. They indicate that there was a serious question in the minds of many of these experts as to whether the standard seven-eighths of an inch cotton staple furnished by the government was in fact seven-eighths of an inch long. The doubt on this point was due to the fact that varying conditions of moisture and temperature affect the staple types and also to the differences in accuracy in the human eye. If it be the fact that about 40,000 additional bales were regarded as improper tender by experts employed by the subcommittee, this may well have been due to

the confusion with regard to the accuracy of the government standards, over which none of the defendants have any control. However that may be, there is no satisfactory evidence presented on this application that more than 6,761 bales were found to be ineligible for tender. As reclassification by the examiners of the appeal board resulted in the rejection of only 1,413 bales, slightly more than one and one-half per cent of the 172,000 bales originally examined, it must be obvious that there is, to say the least, grave doubt that plaintiff will succeed upon the trial of this action in establishing his contention that about 50,000 bales of cotton were or are ineligible for tender. It is indeed difficult to understand upon what theory plaintiff seeks to hold the defendants responsible for permitting the tender of cotton certified by the proper representatives of the United States government even if a great quantity thereof be in fact below the standard specified in the Cotton Futures Act. There is no allegation in the complaint that any of the defendants were even indirectly responsible for the government's approval of ineligible cotton, and there is an entire absence of averments of fact to warrant the conclusions as to legal liability which plaintiff spreads at large over his moving papers. As he has, however, failed to establish the existence at the port of New York of any considerable quantity of ineligible cotton, it is unnecessary to pass upon his right to seek redress from the defendants. The premise upon which his claim of legal liability is based is the presence in this port of large amounts of inferior cotton. With that unproved his entire case falls to the ground and the motion must, therefore, be denied.